UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, | Case No._____ |
| Plaintiff, | |
| | COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT |
| v. | |
| CTI GROUP, LLC, COOPER TRADING, STEPHEN CRAIG SYMONS, and JAMES DAVID KLINE, | ECF Case |
| Defendants, | |
| and | |
| SNONYS, INC. and DRAGONFYRE MAGICK INCORPORATED, | |
| Relief Defendants. | |

By and for its Complaint, the U.S. Commodity Futures Trading Commission ("Plaintiff"
or "Commission") alleges as follows:

## I.  SUMMARY

1.      Since at least in or around August 2009 and continuing through the present (the

"Relevant Period"), Defendants CTI Group, LLC and Cooper Trading (together acting as a

common enterprise referred to herein as "CTI"), and James David Kline ("Kline"), have engaged

and continue to engage in the fraudulent promotion of two automated trading systems ("Trading

Systems" or "Systems") to be used for the trading of E-mini Standard and Poor's 500 Stock Price

Index ("E-mini S&P") futures contracts on or subject to the rules of the Chicago Mercantile

Exchange, Inc., a designated contract market, in managed accounts.

2.      To carry out their fraud, CTI and Kline have engaged, and continue to engage, in a systematic pattern of material false statements and omissions in connection with the marketing of CTI's Trading Systems to clients and prospective clients (referred to herein collectively as "Clients"). Each and every material false misrepresentation and omission made by CTI (by and through its employees and agents) and Kline to Clients, was made with the knowledge that, or made with reckless disregard for the fact that, they were false and misleading.

3.      CTI sells subscriptions to its Trading Systems for $5,000 to $6,000. During the Relevant Period, CTI has sold subscriptions to its Trading Systems to well over 1000 Clients, has received at least $11 million from the sale of its Trading Systems and, on information and belief, continues to receive additional fees from ongoing sales.

4.      To sell subscriptions to its Trading Systems, CTI, by and through its employees and agents including but not limited to Defendant Kline, has made and continues to make material false and misleading statements, and has omitted and continues to omit material information, when soliciting Clients to purchase subscriptions to its Systems. CTI's misrepresentations and omissions concern how long CTI has been in business; CTI's experience developing and marketing Trading Systems; the identities and professional experience of CTI's personnel (who use fictitious names when communicating with Clients); the track record of CTI's Trading Systems; the past profitability of CTI's Trading Systems; the transaction costs associated with trading via CTI's Trading Systems; and the risks associated with trading futures contracts via CTI's Trading Systems.

5.      Moreover, at the very same time that CTI (by and through its employees and agents) and Kline were touting the profitability of one of CTI's Systems, that System had in fact been consistently operating at a net loss for Clients.

6.      CTI also purports to offer a money-back guarantee if its Trading Systems are not profitable. CTI (by and through its employees and agents) and Kline knowingly or recklessly made false and misleading statements about CTI's guarantee, including statements to Clients that CTI has never had to pay a refund to a Client and that the company never received a request for a refund from a Client. In fact, numerous Clients have requested refunds from CTI, and although CTI has ignored or denied many of those requests, CTI has paid refunds to some Clients.

7.      In addition, CTI engages in or has engaged in high-pressure sales tactics, in an effort to induce Clients to subscribe to its Trading Systems without affording Clients an opportunity to conduct due diligence. Because these high-pressure sales tactics include material false statements to Clients about CTI's Trading Systems, these sales tactics operate as a fraud on CTI's Clients.

8.      By engaging in these fraudulent sales practices, CTI and Kline have violated and continue to violate Sections 4$o$(1)(A) and (B) of the Commodity Exchange Act (the "Act"), 7 U.S.C. § 6$o$(1)(A) and (B) (2006). Moreover, by these fraudulent sales practices, CTI has violated and continues to violate Commission Regulation 4.41(a), 17 C.F.R. § 4.41(a) (2011).

9.      CTI has also violated Commission Regulation 4.41(b)(2), 17 C.F.R. § 4.41(b)(2) (2011), by failing prominently to display in certain of CTI's solicitation material a proscribed disclosure statement in immediate proximity to simulated or hypothetical past performance results provided to Clients.

10.      Cooper Trading and CTI Group, LLC (acting as the common enterprise referred to herein as CTI) are also liable for the acts of their employees and agents that violated the Act and Commission Regulations, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), and Commission Regulation 1.2, 17 C.F.R. § 1.2 (2011).

11.     Additionally, Defendants Stephen Craig Symons ("Symons") and Kline are controlling persons of CTI, who have not acted and are not acting in good faith, or who have knowingly induced and are inducing, directly or indirectly, the acts constituting CTI's violations of the Act and Commission Regulations.  Therefore, Defendants Symons and Kline are liable for CTI's violations of the Act and Commission Regulations, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006).

12.     CTI transferred certain of the funds received from CTI's Clients from its operating account to Relief Defendants Snonys, Inc. ("Snonys") and Dragonfyre Magick Incorporated ("Dragonfyre"), which, on information and belief, are companies owned or operated by Defendants Symons and Kline, respectively.  Neither Snonys nor Dragonfyre had a legitimate claim to the ill-gotten funds that were transferred to them by CTI.

13.     Accordingly, pursuant to Section 6c of the Act, as amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act"), Pub. L. No. 111-203, Title VII (the Wall Street Transparency and Accountability Act of 2010), §§ 701-774, 124 Stat. 1376 (enacted July 21, 2010), to be codified at 7 U.S.C. § 13a-1, the Commission brings this action to enjoin Defendants' unlawful acts and practices and to compel Defendants' compliance with the Act and Commission Regulations.

14.     Plaintiff seeks an *ex parte* statutory restraining order and an order for preliminary and permanent injunction, civil monetary penalties, restitution to Clients for losses caused by Defendants' fraud, disgorgement of ill-gotten gains, pre- and post-judgment interest, trading and registration bans as to all Defendants, and such other equitable and ancillary relief as the Court deems necessary or appropriate under the circumstances.

15.     On information and belief, CTI's operations are ongoing.  Moreover, Defendants Symons and Kline have previously operated or been associated with a number of other companies engaging in businesses similar to CTI.  Consequently, unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this Complaint and more fully described below.

## II.  JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to Section 6c of the Act, as amended by the Dodd-Frank Act, Pub. L. No. 111-203, Title VII (the Wall Street Transparency and Accountability Act of 2010), §§ 701-774, 124 Stat. 1376 (enacted July 21, 2010), to be codified at 7 U.S.C. § 13a-1, which authorizes the Commission to seek injunctive relief against any person, or to enforce compliance with the Act, whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

17.     Defendants have solicited and defrauded, or engaged in conduct which operates as a fraud upon, Clients located in this District, and Clients in this District have subscribed to CTI's Trading Systems.  In addition, CTI has referred Clients to an Introducing Broker ("IB") located in this District.  Consequently, venue of this action lies properly with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2006), in that Defendants transacted business within this District, and acts and practices in violation of the Act and Commission Regulations occurred within this District.

### III.  THE PARTIES

**A.    Plaintiff U.S. Commodity Futures Trading Commission**

18.      The Commission is an independent federal regulatory agency that is charged with the responsibility of administering and enforcing the provisions of the Act, 7 U.S.C. §§ 1 *et seq.*, and the regulations promulgated thereunder, 17 C.F.R. §§ 1 *et seq.* (2011).

19.      The purposes of the Act include protecting market participants from fraudulent or abusive sales practices, as set forth in Section 3(b) of the Act, 7 U.S.C. § 5(b) (2006).

**B.    Defendants CTI Group, LLC and Cooper Trading (collectively referred to herein as the common enterprise, "CTI")**

20.      Defendant CTI Group, LLC is a California limited liability company that filed articles of organization with the California Secretary of State on or around August 6, 2009.

21.      On information and belief, Defendant Cooper Trading is a suspended California corporation.

22.      As alleged in more detail below, Defendants CTI Group, LLC and Cooper Trading have engaged in a common enterprise for the purpose of soliciting Clients to subscribe to two Trading Systems.  The common enterprise is referred to herein as "CTI."  CTI began doing business in or around July 2009.

23.      At all relevant times, CTI has conducted business at 5120 West Goldleaf Circle, Suite 240, Los Angeles, CA 90056 and 3990 Westerly Place, Suite 210, Newport Beach, CA 92660.

24.      As of August 2011, approximately 15 people worked in CTI's Newport Beach office, and approximately 28 people worked in CTI's Los Angeles office.

25.      Neither Cooper Trading nor CTI Group, LLC has ever been registered with the Commission in any capacity.

**C.      Defendant Stephen Craig Symons**

26.        Defendant Symons is a resident of Corona del Mar, California.

27.        In or around 2000, Symons was convicted in Los Angeles County Superior Court for grand theft and material misrepresentation in connection with the sale of securities and served more than 43 months in prison.

28.        Symons has used numerous fictitious names since 2000, including the fictitious name he currently uses at CTI, "Burt Monroe."

29.        Symons founded CTI in or around July 2009 and has received at least $1.3 million in income from CTI.

30.        Symons works in CTI's Los Angeles office.

31.        Although Symons was at one time registered with the Commission as a floor broker, that registration was withdrawn in 1982.  Symons is not currently registered in any capacity with the Commission.

**D.      Defendant James David Kline**

32.        Defendant Kline is a resident of Van Nuys, California.

33.        Kline holds himself out to the public as CTI's General Manager and Chief Compliance Officer (or Compliance Officer).  In addition, Kline supervises the sales staff in CTI's Los Angeles office.

34.        Kline has used numerous fictitious names since 2000, including the fictitious name he currently uses at CTI when communicating with Clients, "Mark Bishop."

35.        Kline has never been registered in any capacity with the Commission.

**E.      Relief Defendants Snonys, Inc. and Dragonfyre Magick Incorporated**

36.        Relief Defendant Snonys, Inc. ("Snonys") is a California corporation, which, on information and belief, is owned or operated by Defendant Symons.

37.     Relief Defendant Dragonfyre Magick Incorporated ("Dragonfyre") is a California corporation, which, on information and belief, is owned or operated by Defendant Kline.

### IV.  CTI'S SCHEME TO DEFRAUD CLIENTS

**A.     Cooper Trading and CTI Group, LLC Operated as a Common Enterprise**

38.     During the Relevant Period, the entities Cooper Trading and CTI Group LLC have functioned as a common enterprise for the purpose of soliciting Clients to subscribe to two Trading Systems, known as the Boomer and Victory Trading Systems.  That common enterprise is referred to herein as "CTI."

39.     Because Cooper Trading and CTI Group, LLC have operated as a common enterprise, each company is jointly and severally liable for the other's violations of the Act and Regulations.

40.     CTI initially operated under the name "Cooper Trading, Inc." or "Cooper Trading Incorporated."  Shortly after commencing operations, negative information about "Cooper Trading" began to appear on the internet.  In response, Defendant Symons directed that salespersons refer to the company simply as "CTI."  Around that time, CTI Group, LLC was formed.

41.     Since that time, and at all times during the Relevant Period, salespersons referring to their company as "CTI" or "CTI Group" in telephone calls with Clients have solicited Clients to subscribe to the Boomer and Victory Trading Systems.

42.     During the Relevant Period, CTI's subscriber license agreements with Clients have referred to the marketer and licensor of the Boomer or Victory Systems variously as "Cooper Trading, Inc.," "CTI Group LLC," and "CTI."

43.     During the Relevant Period, salespersons soliciting Clients to subscribe to the Boomer and Victory Trading Systems have referred to themselves in written communications

with Clients and in promotional materials as working variously for "CTI," "CTI Group," and "CTI Group LLC."

44.     In addition to interchangeably using the names Cooper Trading, Inc., Cooper Trading Incorporated, CTI, CTI Group, and CTI Group LLC while marketing the Boomer and Victory Systems, the enterprise has since its inception consistently operated out of the same two office locations, used the same promotional materials, used a common mailing address and telephone number, and operated from a single bank account (in the name of "Cooper Trading").

45.     Moreover, during the Relevant Period, CTI personnel have consistently used "autofuturestrading.com" as their email address.

46.     Checks issued from the Cooper Trading bank account bear the name "Cooper Trading" or "CTI," as well as the address for CTI's Newport Beach office or the CTI mailing address routinely given to Clients in solicitation materials.

47.     The Cooper Trading bank account has received multiple wires from Clients paying for their subscriptions to the Boomer or Victory Systems.

48.     On information and belief, funds from Clients paying for Boomer and Victory subscriptions by credit card have also been transferred into the Cooper Trading bank account.

49.     The Cooper Trading account has also been used to make payments, directly or indirectly, to Defendants Symons and Kline, to salespersons responsible for soliciting Boomer and Victory Clients, and to the developer who created the Boomer and Victory Trading Systems.

50.     Defendant Symons founded and maintains control over CTI's operations.  For example, Symons trains salespersons and decides both what Systems will be sold to the public and how much sales personnel and CTI's System developer are paid.

**B.     The Trading Systems**

51.     Cooper Trading and CTI Group, LLC, operating as the common enterprise CTI, have marketed and licensed Trading Systems to members of the public.

52.     Specifically, during the Relevant Period, CTI has solicited members of the general public to purchase subscriptions to two Trading Systems, the Boomer and Victory Systems.

53.     These Trading Systems are marketed to the public as computerized systems that automatically trade the E-mini S&P futures contract on an intraday basis.

54.     After a Client purchases a subscription to one of CTI's Trading Systems, CTI refers the Client to an Introducing Broker ("IB"), and the Client opens a managed trading account with that IB.

55.     When a Client opens a managed trading account with one of the IBs specified by CTI, the Client completes various account opening documents, including a letter of direction, directing the IB to place trades in the Client's managed trading account as directed by the Trading System to which the Client subscribed.

56.     CTI's IBs run CTI's Trading Systems on a computerized trading platform called Trade Station, and the Systems thereby generate buy and sell signals.

57.     The IBs in turn place orders in each Client's managed trading account consistent with the buy and sell signals generated by the Trading System to which each Client subscribes.

58.     CTI's IBs earn a commission on each trade placed in Clients' managed trading accounts.

59.     Each of CTI's Trading Systems has been developed by applying various trading strategies to known historical trading data.  This process is known as "back-testing," and it does not involve any actual trading.

60.    By the use of back-testing during the development of CTI's Trading Systems, CTI's System developer is able, with knowledge of past market patterns and trends, to construct a profitable hypothetical past performance history when developing the Trading System.

**C.    The Sales Process**

61.    CTI sells its Trading Systems through a telemarketing scheme, whereby CTI's salespersons obtain telephone numbers of potential Clients from a database of leads and place unsolicited cold calls to potential Clients.

62.    CTI sells subscriptions to its Trading Systems to Clients for a one-time payment of $5,000 to $6,000, and CTI's salespersons are paid a commission of $600 to $900 per subscription sold.

63.    The sales process, from the initial cold call to the time the Client subscribes to a Trading System, involves between one and three CTI salespersons and can be completed in as little as a few minutes or can extend for weeks over the course of multiple telephone calls.

64.    Typically, Clients are initially contacted by what CTI refers to as an "Opener," who determines whether or not the Client has an interest in subscribing to a Trading System. CTI's Openers are expected to make a minimum of 200 to 300 calls per day.

65.    If the Client expresses interest, the Client is typically passed to what CTI refers to as a "Closer," who speaks to the Client in more detail about the Trading System.

66.    As part of the solicitation process, a CTI salesperson typically directs the Client to CTI's password-protected website, www.autofuturestrading.com, and provides the Client with usernames and passwords so that the Client can access information on the website.

67.    Once on CTI's website, and while still speaking with a salesperson, Clients are directed to look at, among other things, a purported month-by-month, trade-by-trade track record for the Trading System being offered.

- 11 -

68.      As part of the solicitation process, Clients are told that when they fund their trading account with the IB, they will be required to deposit $2,500 for each futures contract that the Client intends to trade pursuant to the Trading System.

69.      If the Client agrees to purchase a subscription to the Trading System, the Closer completes the sale, obtains the Client's electronic signature on CTI's online subscriber license agreement, and obtains the Client's payment information (usually via credit card).

70.      Clients then speak with Defendant Kline, who, using the fictitious name "Mark Bishop," identifies himself as CTI's "Chief Compliance Officer" (or "Compliance Officer") and "General Manager."  During this phone call, which CTI refers to as a "compliance call," Defendant Kline, among other things, confirms the Client's payment information and billing address, confirms that the Client approves of the charge, charges the Client's credit card, and asks how many futures contracts the Client intends to trade pursuant to CTI's Trading System. CTI records these "compliance calls."

71.      After the "compliance call," Defendant Kline emails the Client's contact information and the number of contracts that the Client intends to trade to one of CTI's IBs.  The IB subsequently contacts the Client to open the Client's managed trading account.

**D.    False Statements and Material Omissions about CTI and Its Personnel**

72.      During the solicitation of Clients, CTI, by and through its employees and agents, has knowingly or recklessly made, and on information and belief knowingly or recklessly continues to make, material false statements to Clients about CTI's operations and personnel.

73.      Specifically, in order to make it appear that CTI has an established track record researching, developing, and marketing Trading Systems, CTI (by and through its employees and agents) and Kline have knowingly or recklessly made materially false statements to Clients about how long CTI has been in business, including:

a. On or around February 15, 2011, a CTI salesperson using the fictitious name "Corey Graham" sent an email to a Client falsely stating that CTI had "been in business for 10 years."

b. In or around February 2011, Defendant Kline stated to a Client during a "compliance call" that CTI was not a fraud and that CTI had been in business for ten years.

c. Similarly, during a solicitation call in or around April 2010, a CTI salesperson using the fictitious name "Mike Turner" falsely stated to a Client during a telephone conversation that CTI had been in business for seven years and "we've been successful."

d. "Turner" further falsely claimed to the Client that August 6, 2009 – a date which appears on the California Secretary of State's website and is actually the date CTI Group, LLC filed its articles of organization – was the date of CTI's last audit.

e. Defendant Kline told Clients during his "compliance calls" in 2010 and 2011 that CTI had been doing business long before 2009, stating, for example, in or around December 2010 to one Client that the company had been doing business for almost ten years, and stating in or around October 2010 to another Client that the company had been doing business for almost nine years.

f. Defendant Kline told numerous Clients during "compliance calls" in 2010 and 2011 that he, Kline, had worked for CTI for five years.

74.     These statements are false because CTI did not begin to conduct business until in or around July 2009.

75.     CTI, by and through its employees and agents, also knowingly or recklessly misstated to Clients that it was a well-established company with a long track record of researching, developing, and marketing Trading Systems by falsely claiming to Clients, both during telephone solicitations and on CTI's website, that CTI had offered numerous Trading Systems prior to Boomer and Victory.

76.     For example, CTI, by and through its employees and agents, knowingly or recklessly falsely stated to Clients, both in telephone solicitations and on CTI's website, that three earlier Trading Systems – Jaguar, Tiger, and Lion – had been subscribed to capacity, and in the words of CTI salesperson "Mike Turner" to a Client during a telephone call in or around April 2010, had been "closed out" but were "doing just fine."

77.     Similarly, in or around March 2011, a CTI salesperson misstated during a telephone solicitation that the Victory Trading System is, in the words of one of CTI's Openers, "one out of five different trading systems that we make available."

78.     In or around February 2011, Defendant Kline knowingly or recklessly falsely told a Client during a "compliance call" that he, Kline, subscribed to three of CTI's Trading Systems, including Jaguar.

79.     In fact, CTI never offered Jaguar, Tiger, or Lion to members of the public, and CTI never had any Clients that traded pursuant to any Trading Systems called Jaguar, Tiger, or Lion. CTI has never offered the public any Trading Systems other than the Boomer and Victory Systems.

80.    CTI, by and through its employees and agents knowingly or recklessly made, and on information and belief continues knowingly or recklessly to make, material misrepresentations about salespeople's identities, their role at CTI, and their professional experience.

81.    In conversations or communications with Clients, CTI's salespersons knowingly or recklessly falsely refer to themselves as being an "owner," "founder," "Senior Partner," or "President" of CTI.  For example:

        a.   CTI routinely identifies Closers to Clients as "Senior Partners" of CTI, notwithstanding that CTI's Closers do not have any ownership or equity interest in the business; and

        b.   CTI salespersons conduct what one CTI salesperson has described as an "owner call," in which CTI salespeople (at Defendant Symons' direction) falsely identify themselves as an owner or founder of CTI in communications with Clients, who have purchased a subscription to a Trading System but who are having second thoughts about the purchase, in order to lull the Clients into believing that they should not be concerned.

82.    CTI, by and through its employees and agents, also knowingly or recklessly falsely claimed that its owners, managers, employees, or agents had substantial experience either trading futures contracts or researching and developing the technology underlying CTI's Trading Systems.

83.    For example, on or around February 15, 2011, CTI salesperson "Corey Graham" falsely stated in an email to a Client that CTI's partners "were trader's [sic] on the floor of the Mercantile Exchange for over 40 years…." (which was not the case).

84.     Moreover, certain of CTI's promotional material describes "CTI's Senior Officer" "Burt Monroe" as a "veteran trader" and "Jack Logan" as CTI's "Senior Technology Director" and a "[w]ell-known Designer and Senior Programmer."

85.     Additionally, in or around July 2010, "Jack Logan" falsely described himself in a telephone call with a Client as an owner of CTI and has stated that he, Logan, spent nearly 13 years developing the technology behind CTI's Trading Systems.

86.     "Mark Bishop" has stated to Clients during "compliance calls" in 2010 that he is the "Chief Compliance Officer" (or "Compliance Officer") of CTI, that he earned an economics degree, that he had been "in the industry about 25 years," and that he has a "long history of business management."

87.     These statements about "Burt Monroe," "Jack Logan," and "Mark Bishop" are false because there are no individuals associated with CTI who are actually named Burt Monroe, Jack Logan, or Mark Bishop.  Rather, "Burt Monroe" is a fictitious name used by Defendant Symons, "Jack Logan" is a fictitious name used by one of CTI's Closers, and "Mark Bishop" is a fictitious name used by Defendant Kline.

88.     Prior to working at CTI, the person at CTI who uses the fictitious name "Jack Logan" used at least five other aliases.

89.     Far from being an owner, Senior Technology Director, designer, or programmer for CTI, as he has described himself to Clients, the person at CTI who uses the fictitious name "Jack Logan" has never had any ownership interest in CTI, has no education or experience in computer programming, has never been involved in the research or development of CTI's Trading Systems, and has testified under oath that he does not even know what a futures contract is.

90.     Most, if not all of CTI's personnel, use fictitious names when communicating with Clients.

91.     By using fictitious names, CTI, by and through its employees and agents, knowingly or recklessly mislead Clients about the true identity of CTI salespeople, their professional and educational backgrounds, and avoid disclosing material negative information, including the criminal convictions of key CTI personnel.

92.     For example, by referring to Defendant Symons falsely as "Burt Monroe," Defendants concealed from CTI's Clients that Symons was convicted of grand theft and material misrepresentation in connection with the sale of securities and served more than 43 months in prison.

93.     By virtue of one of CTI's Closer's use of the fictitious name "Jack Logan," Defendants concealed from CTI's Clients that for most of the time since in or around 2000, rather than working on the technology behind CTI's Systems, as he claimed to a Client, that Closer has either been in prison following his conviction for sex with a child under the age of 16, or working as a telemarketer selling, among other things, cemetery plots and sushi makers.

94.     Similarly, by using the fictitious name "Mark Bishop" for Defendant Kline, Defendants knowingly or recklessly concealed from CTI's Clients that Kline never earned a degree in economics, as "Mark Bishop" (*i.e.*, Kline) claimed to Clients, and that from in or around 1995 until in or around 2008, Kline (CTI's purported Chief Compliance Officer or Compliance Officer) held a string of non-finance related jobs, including telemarketing and sales (for, among other things, discount coupon books, sports betting advice, and real estate time shares) and provided psychic readings over the phone using the pseudonym "Ivan."

**E.    False Statements and Material Omissions about the Hypothetical Past Performance of CTI's Systems**

95.      During the solicitation process, CTI, by and through its employees and agents, has knowingly or recklessly made, and on information and belief continues knowingly or recklessly to make numerous false statements to Clients about the track record of CTI's Trading Systems.

96.      CTI provides Clients during the solicitation process and thereafter with access to CTI's website, which purports to show month-by-month, trade-by-trade results for the Boomer and Victory Systems, dating from 2003.

97.      CTI, by and through its employees and agents, knowingly or recklessly routinely states to Clients that the Boomer and Victory Trading Systems have been trading "live" since 2007 or earlier and that the performance history on CTI's website for each System since 2007 or earlier reflects actual trading in managed accounts pursuant to the buy and sell signals generated by CTI's Systems.

98.      For example, in or around April 2010, CTI salesperson "Mike Turner" told a Client during a telephone call that the Boomer Trading System "started trading in 2003 but it didn't start trading live until January of 2007."

99.      Defendant Kline has knowingly or recklessly stated to Clients the Victory System began trading live in or around October 2007 (including, for example, during a "compliance call" in or around January 2011 and in an email to a Client in or around September 2010).

100.      Defendant Kline (referring to the Victory Trading System) knowingly or recklessly falsely stated to a Client, during a "compliance call" in or around December 2010, that "the version of the System that you are buying began trading live in October 2003 and those [the data on CTI's website for trades from October 2003] are real trades" and falsely stated that only

a "small portion" of the historical trade data for CTI's Systems is back-tested, no more than "7 to 18 months."

101.　　Defendant Kline testified under oath that any statement that the Victory System had been "live trading with profits" since October 2003 "without using a hypothetical or indicating there was back-testing, yes, that would be misleading."

102.　　Although CTI represents to Clients that its Trading Systems have traded live and performed profitably since 2007 or earlier, in fact CTI's System developer did not create the Boomer and Victory Trading Systems until July 2009 and May 2010, respectively.

103.　　In addition, notwithstanding Defendant Kline's statement to a Client that CTI's historical track records contained no more than 7 to 18 months of back-tested data, in fact, *all* of the data provided to Clients for the Boomer and Victory Trading Systems prior to their creation in July 2009 and May 2010, respectively, going back to 2003, was back-tested data (*i.e.*, approximately 69 months of back-tested data for Boomer and 79 months of back-tested data for Victory).

104.　　CTI, by and through its employees and agents, knowingly or recklessly did not disclose and concealed and continues to conceal from Clients that the Systems' purported track records prior to 2009 for Boomer and prior to 2010 for Victory did not reflect actual trades, but rather were based on hypothetical, back-tested results.

105.　　CTI (by and through its employees and agent) knowingly or recklessly stated to Clients that its Trading Systems performed particularly well in 2008, when the stock market was experiencing large losses, when in fact the Systems had not actually been trading in 2008.

106.　　For example, in or around April 2010, during a telephone solicitation, CTI salesperson "Mike Turner" directed a Client to the Boomer System's purported profit of

$2,137.50 for the month of October 2008 and falsely stated "that's real" and "that was during one of the worst months in the history of the stock market."

107.    By this misrepresentation, CTI concealed from Clients that CTI's Systems were not trading in 2008, and that the 2008 trading results posted on CTI's website and solicitation materials are hypothetical performance records concocted *after* 2008.

108.    By claiming that CTI's Trading Systems have been trading live and profitably since 2007 or earlier, CTI, by and through its employees and agents, knowingly or recklessly provided materially false or misleading information to Clients.

109.    Moreover, although the performance histories on CTI's website and solicitation materials contain both back-tested hypothetical results and results generated since CTI's Clients actually started trading CTI's Systems, those promotional materials do not disclose which of the Boomer and Victory performance data were hypothetical and which of the performance data were generated after CTI's Clients actually began to trade.

110.    In addition, although CTI ostensibly included on its website a "disclosure statement," containing, among other things, disclosures regarding hypothetical performance, CTI downplays and negates the significance of those disclosures in CTI's oral solicitations.

111.    For example, during a telephone call with a Client in or around April 2010, CTI salesperson "Mike Turner," in his explanation of the disclosures contained on CTI's website, did not discuss the hypothetical nature of CTI's past performance results, but instead stated that the disclosure section "just means that you would only use risk capital to trade with" and "that's why we have this disclosure and if you understand that you can scroll down to the bottom and click on 'I agree.'"

112.     CTI also failed to provide a legible, prominent disclosure regarding the limitations of hypothetical past performance data in immediate proximity to hypothetical performance results provided to Clients in certain of CTI's promotional material.

113.     For example, although CTI provides a disclaimer regarding hypothetical trading data in certain of CTI's promotional material, the disclaimer is presented in small, illegible type.

**F.     False and Misleading Statements and Omissions of Material Facts about Slippage**

114.     In soliciting Clients, CTI, by and through its employees and agents, knowingly or recklessly misled, and on information and belief knowingly or recklessly continues to mislead, Clients about the transaction costs associated with trading using its Trading Systems.

115.     Slippage is the difference in the market price at the time a buy or sell signal is generated by a Trading System and the actual price of the trade executed by the IB.

116.     Slippage can be a significant transaction cost associated with trading pursuant to an automated trading system.

117.     As CTI personnel, including Defendant Symons, have admitted in sworn testimony, slippage usually has a negative impact on the profitability of trades.

118.     Defendant Symons has also testified that he instructs all CTI salespersons to advise Clients about slippage costs associated with trading CTI's Systems.

119.     Nevertheless, although discussing with Clients the purported past and future profitability of CTI's Systems, CTI (by and through its employees and agents) and Kline, knowingly or recklessly routinely either fail to mention the impact of slippage on System returns in communications with Clients, or knowingly or recklessly misrepresent the effects of slippage on potential profitability.

120.     By doing so, CTI (by and through its employees and agents) and Kline knowingly or recklessly mislead Clients about the past and potential profitability of trading via CTI's Trading Systems.

121.     For example, in or around October 2010, Defendant Kline, referring to the Victory Trading System, stated in an email to a Client that "slippage should work out to about a point per trade [*i.e.*, $12.50] *worst case scenario*, and slippage should go both positive and negative, so *it should be 'a wash.'*"  (Emphasis added.)

122.     One day before Defendant Kline stated to a Client that slippage "should be a wash," Defendant Symons stated in an email to one of CTI's IBs that CTI had switched from selling the Boomer System to the Victory System "[b]ecaise [sic] of the slippgae [sic] on the Boomer. [The developer] told me with a new system we wouldny [sic] have the issue[.] Obviously that is not the case…I have sent [the developer] an email asking him for another system."

123.     Moreover, at around the same time, one of CTI's IBs notified CTI by email that "[g]oing forward I'm going to have to start telling clients that there is going to be approx. $55 they should include for commission and slippage….This will be for [V]ictory going forward…."

124.     Defendant Kline also knowingly or recklessly misstated the effects of slippage in numerous "compliance calls" with Clients, for example, stating in or around March 2011 that slippage is a "rare occurrence," stating in or around November 2010 that slippage is "infrequent" and that it "does go both ways," and stating in or around January 2011 that "usually it's nominal" and is "both positive and negative" for the Client.

125.     Defendant Kline knew, based on prior Client complaints regarding the Boomer System, that slippage could – and did – cause significant trading losses.

G.     **False Statements and Omissions of Material Facts about the Past Profitability of CTI's Trading Systems**

126.     In soliciting Clients, CTI, by and through its employees and agents, knowingly or recklessly made numerous false statements to Clients about Boomer and Victory's past profitability since 2007 or earlier, including:

a.     On or around February 15, 2011, CTI salesperson "Corey Graham" stated in an email to a Client that Victory "has been *consistently* bringing in a MONTHLY profit averaging **7-11%** net-monthly" since 2007 (bold and italics in the original) (when in fact CTI (by and through its employees and agents) knew or recklessly disregarded the fact that Victory did not begin trading until the summer of 2010 and had not consistently earned a monthly net profit of 7-11%);

b.     Similarly, Defendant Kline knowingly or recklessly misstated in emails to multiple Clients that "this version" of Victory has been trading since 2007 and has "averaged a return of $525 per $2500 traded per month" (including, for example, an email to a Client in or around September 2010);

c.     In or around April 2010, in a telephone solicitation, CTI salesperson "Mike Turner" told a Client that the Boomer System has been trading live since 2007, is "very profitable," that the Client would have "actually made" approximately $400 per month on a $2,500 investment if the Client had been trading since 2007, that the System "is a great way to put your money to work," is a "very good trading system," and would "definitely help pay for the college tuition, that's for sure" (when in fact CTI (by and through its employees and agents) knew or recklessly disregarded the fact that Boomer

did not begin trading until 2009, and had not earned an average of $400 per month).

127.    CTI's claims about Boomer and Victory's profitability since 2007 or earlier are false and misleading because, among other things, neither Boomer nor Victory was actually trading in 2007 or earlier.

128.    Referring to the Victory Trading System, during a telephone solicitation, a CTI salesperson falsely stated to a Client in or around March 2011 that the "average client with us has been averaging, we've been averaging just over $500 to somewhere between $1000 per month, actually over that, per month" on a $2,500 trading account, when in fact CTI (by and through its employees and agents) knew or recklessly disregarded the fact that Victory Clients had not been averaging $500 to $1000 in profits per month on a $2,500 trading account.

129.    Defendant Kline knowingly or recklessly falsely stated to Clients in numerous "compliance calls" that he, Kline, personally traded CTI's Systems and that those Systems had been profitable:

   a.   In or around August 2010, Defendant Kline told a Client that he, Kline, had been trading the Boomer System "just about three and a half years," that the System has "done very well," and that the System has provided "good, strong, consistent income, which I, which I like."  (In fact, Defendant Kline knew that he, Kline, had never traded the Boomer System.  Moreover, Kline knew or recklessly disregarded the fact that as of July 2010, the Boomer System had actually generated a net loss for Clients who had traded Boomer since August 2009.)

b.  In or around February 2011, Defendant Kline falsely stated to a Client that he,
Kline, owned three of CTI's Systems (Jaguar, Boomer, and Victory) and
specifically noted that he had owned Victory for "about three years" and that
as a result, he would not have to use his retirement or savings to help support
his two children who were going to college.  In fact, Kline knew that he had
never personally traded any of CTI's Systems, much less used System profits
to help put his children through college.

c.  At around the same time, Defendant Kline told another Client that he, Kline,
had owned the Victory System for "nearly three years now," that he was "very
happy with it," that it was a "very steady consistent strong System," and that
he was "actually pretty grateful for the little System because it's helping pay
some tuition bills."  As Kline knew, he never actually traded the Victory
System, much less paid tuition bills with System profits.

d.  Around the same time, Defendant Kline told another Client that he, Kline,
owned several of CTI's Systems, including Victory (which Kline claimed to
have traded for three years).  Defendant Kline stated that the System was
"very very good" and that it "historically has done very very well" and
"generates a very consistent profit."  These statements were false and
misleading because Kline never traded any of CTI's Systems.

130.    CTI, by and through its employees and agents, also knowingly or recklessly
inflated purported trading results for its Trading Systems, both in its promotional materials and
on CTI's website, by describing past profits as "net" profits, notwithstanding that those posted
"profits" did not include transaction costs.

131.     CTI (by and through its employees and agents including Kline and Symons) knew

that CTI's Trading Systems were not earning the profits touted by CTI's salespersons and posted

on CTI's website.  For example, in a May 11, 2010 email from Defendant Symons to CTI's

System developer, Symons stated:

> The [B]oomer is taking to [sic] many lose [sic] that are big and the winners [sic]
> are small. I have had an account with [CTI's IB] that I opened up October 1st
> 2009. I opened with 2500 and as of today incliding [sic] the loss with
> commissions and[ ]slippage [sic] I am at 2180. So in essence I am down 14% in 7
> and a half months. Not good !

132.     Moreover, an account owned by CTI's Newport Beach office manager

(Defendant Symons' brother), which was trading the Boomer System, was down from $2,500 to

less than $2,000, a loss of more than 20%, for the period October 2009 to July 2010.

133.     Nevertheless, CTI, by and through its employees and agents, knowingly or

recklessly continued to sell the Boomer Trading System and to make false statements to Clients

as to the System's performance.  For example, a CTI salesperson stated to one Client in a

telephone solicitation in or around August 2010 that the Client could expect to earn back the

Boomer System subscription purchase price of $6,000 in six months.

134.     Soliciting another Client to purchase a subscription to the Boomer System, CTI

salesperson "Jack Logan" sent an email to the Client in or around August 2010, which contained

purported past performance information for the Boomer System touting a "Net Profit" of $2,525

for the period October 1, 2009 to August 1, 2010, which was false because the System actually

traded at a net loss over that period.

135.     On information and belief, CTI's Systems have not earned Clients the extravagant

profits touted by CTI's salespersons.  Rather, on information and belief, many if not most, of

CTI's Clients have earned little or no net profit or incurred losses.

**H.     False Statements about CTI's Guarantee**

136.     CTI purports to offer all Clients a money-back guarantee if its Trading Systems are not profitable.

137.     CTI has described its guarantee in promotional materials as "our promise of quality and performance" and that "[i]f our system fails to perform, then we must refund your cost for the program in full."

138.     CTI (by and through its employees and agents) and Kline have knowingly or recklessly made false statements or omitted material information with respect to CTI's guarantee, including falsely stating to Clients that CTI has never had a Client request a refund and that CTI has never had to pay a refund to a Client.

139.     For example:

   a.   In or around September 2010, Defendant Kline stated to a Client during a "compliance call" that "in almost nine years of doing business, we've never had to pay out a refund."

   b.   In or around December 2010, Defendant Kline stated to a Client during a "compliance call" that "in almost ten years of doing business, we have not had to pay a refund back," and that in the event that "you only made $100 in a year, we're obviously going to give your purchase price back, we've never been through anything like that before, but we would deem that certainly as fair."

   c.   During a "compliance call" in or around December 2010, Defendant Kline responded to a Client's question concerning how many people had received refunds and stated "not really anybody" in "almost ten years."  Defendant

Kline further stated that he, Kline, has "been here for five [years], and I know we've never had to refund anybody in that time period."

d.  During a "compliance call" in or around February 2011, Defendant Kline told another Client that "we haven't had to pay out on a guarantee at least in the five years I've been here so we're in good shape."

e.  In or around February 2011, Defendant Kline told another Client during a "compliance call" that in "close to ten years of doing business we've never had to issue a refund."

f.  In or around March 2011, Defendant Kline told another Client during a "compliance call" that "we've never had to issue a refund on one of the Systems."

g.  During a telephone call in or around January 2011, CTI salesperson "Jack Logan" told a Client that "I never have had a Client send [a request for a refund] because of the returns we're making" and that if the Client is "worried that you only made $1 or $100 or $500 or $1000…I'm going to refund your money…because no one ever makes just that amount" and "if it comes to the point and I'll state it again where you only made a dollar or $50 or $100 or $500 at the end of 12 months, I'm not going to have someone disgruntled, I will honor guaranteeing the refund to you."

h.  During a telephone call in or around May 2011, in response to a question from a Client regarding CTI's refund policy, "Jack Logan" stated "put the request in writing if you are canceling out, we need a letter, a FedEx, a fax or an email, that says look you guys are dogs, you lied to me, you're horrible, I hate

you, and you know give me my money back.   Okay, I have yet to have it

happen with anyone, it hasn't occurred.  You'll be fine."

140.     Notwithstanding CTI's assurances to Clients that CTI never had to pay a refund

and that CTI had never received a request for a refund, in fact Clients had requested refunds from

CTI.  Moreover, although CTI ignored or denied many of those requests, CTI has given refunds

to some of its Clients since in or around at least May 2010.

141.     CTI statements that it never had to issue a refund in five, nine, or ten years of

doing business are also false and misleading because CTI did not begin conducting business until

in or about July 2009.

**I.     Misrepresentations Regarding the Risks Inherent in Trading Futures Contracts**

142.     CTI (by and through its employees and agents) and Kline also knowingly or

recklessly engaged, and on information and belief knowingly or recklessly continue to engage, in

sales practices that misrepresent the risks associated with trading futures contracts.

143.     For example, CTI states in certain of its promotional material that its Trading

Systems have "a Max-Loss of $337.50 per contract" or a "max loss of 350.00 per contract."

144.     Defendant Kline has stated to numerous Clients (during "compliance calls") that

there is a "hard-wired fixed stop" in CTI's Systems and that the most that a Client could lose on

a given trade is $337.50.

145.     However, Defendant Kline knowingly or recklessly did not disclose in his

conversations with Clients that this "fixed stop" does not necessarily limit losses to the intended

amount, since market conditions may make it impossible to execute a stop-loss or stop-limit

order.

146.     In or around April 2010, CTI's salesperson "Mike Turner" misled a Client during a telephone call concerning the risks of trading futures contracts by misrepresenting that the Boomer System was a "very good way to limit your risk."

147.     On or around February 15, 2011, CTI salesperson "Corey Graham" stated in an email to a Client that the Victory Trading System is a "conservative, consistent, low risk program."

148.     CTI (by and through its employees and agents) also knowingly or recklessly misrepresented the risks associated with trading futures contracts by purporting to offer a money-back performance guarantee to Clients while at the same time touting the past and potential profitability of CTI's Systems.

149.     Kline also knowingly or recklessly misrepresented the risks associated with trading futures contracts by making baseless claims about the future profitability of CTI's Trading Systems.  For example:

      a.  Referring to the Victory Trading System, Defendant Kline stated to Clients during "compliance calls" (for example in calls with two Clients in September 2010 and December 2010, respectively) that they could expect a one-year profitability of $4,000 to $7,000, trading one contract (which is a return of 160% to 280%).  These statements were baseless because Victory had actually been trading just a few months when those statements were made.

      b.  Referring to the Victory Trading System, Defendant Kline told a Client during a "compliance call" in or around March 2011 that "we've had a lot of success with this System over the years," that "you're probably looking at making anywhere from say 5 to 12% a month" trading one contract, that there are

"stop gaps" and "protective features" built into the System, that the System is "pretty safe," and that the System is "relatively very very safe." These statements were baseless because, among other reasons, Victory had actually been trading for approximately only seven months when the statements were made, not a number of years.

c. During another "compliance call," after a Client told Defendant Kline that the Client would be investing retirement funds, Kline told the Client in or around May 2011 that the Victory Trading System is a "very very good System" and that it is a "good, steady, conservative System that per contract is probably going to pick you up about three to five hundred [dollars] a month for...I mean it goes on in perpetuity, 25 to 30 years." This statement was made in reckless disregard of the fact that Victory Clients had not actually been making $300-500 per month since the System actually began trading.

d. Kline made these statements knowing that previous Clients, who had traded the Boomer System, had actually suffered net losses.

150.     By these and similar statements, CTI, by and through its employees and agents, has knowingly or recklessly misrepresented, or misled Clients, regarding the risks associated with trading futures contracts and misrepresented the profit potential from trading via its Systems.

## J.     Fraudulent Sales Tactics

151.     CTI, by and through its employees and agents, has also knowingly or recklessly made, and on information and belief continues knowingly or recklessly to make false statements to Clients as part of the solicitation process.

152.     CTI salespersons have falsely stated to Clients that they are being offered one of the final remaining slots to trade CTI's Systems or that CTI is "closing the program today." By making these false statements to Clients, CTI's salespersons pressure Clients to purchase subscriptions to CTI's Trading Systems immediately and without affording Clients an opportunity to conduct due diligence.

153.     For example, in or around May 2011, a CTI salesperson falsely stated to a Client during a telephone solicitation that the Victory Trading System would no longer be accepting additional subscribers as of that evening and would no longer be available for purchase.

154.     In fact, the Victory Trading System did not close in May 2011; rather, on information and belief, CTI continues to solicit Clients to purchase subscriptions to the Victory Trading System.

155.     Similarly, CTI salesperson "Mike Turner" stated to a Client in or around April 2010 during a telephone solicitation that the Boomer Trading System was limited to "300 traders" and had only a "couple of openings left."

156.     CTI also states to Clients that its Trading Systems normally sell for $7,500 plus a monthly fee of $199, but that the System is being offered at a "discount" for a one-time fee of $5,000 or $6,000.  Sometimes the CTI salespersons state to Clients that the "discount" pricing may not be available if the Client delays.

157.     In or around April 2010, CTI salesperson "Mike Turner" falsely stated in a sales call that the "actual cost of the [Boomer] Trading System" and the price "most of our clients are paying" is $7,500 with an additional $199 monthly maintenance charge, and that "no one has complained about" the maintenance charge because "the System's been doing very well

obviously." He further stated that "if you do this today, I can get you a broker's discount" price of $6,000.

158.    CTI's statements about "discounts" are false statements intended to pressure Clients into purchasing subscriptions to CTI's Systems. In reality, the reduction in price from $7,500 to $5,000 or $6,000 is not a discount because CTI never charges more than $6,000 for its Systems. In addition, CTI has never charged a Client a monthly fee of $199.

159.    Moreover, by virtue of "Turner's" falsely stating that other Clients have paid a $7,500 licensing fee and a $199 per month maintenance charge and that no one has complained about those charges because "the System's been doing very well obviously," CTI (by and through its employees and agents) knowingly or recklessly misled Clients about the past and potential profitability of CTI's Systems.

**K.    Defendants Symons and Kline Control CTI and Participated in Its Wrongful Conduct**

160.    Defendants Symons and Kline control CTI.

161.    Symons made the decision to start CTI and contributed $50,000 of his own capital to do so.

162.    Symons hired Defendant Kline as a sales manager for CTI.

163.    Symons established CTI's relationship with at least two of CTI's IBs.

164.    Symons decides how much to pay CTI's salespersons.

165.    Symons is responsible for decisions regarding the development of CTI's Trading Systems. Symons chose CTI's System developer and negotiated the amount CTI would pay the developer per System sold.

166.     Symons also has the title "Director of Education" at CTI and is responsible for training CTI's sales staff, including but not limited to telling staff what to say to Clients about how long each of CTI's Systems had been trading "live" and what to tell Clients about slippage.

167.     Symons has also directed CTI's salespeople falsely to identify themselves to Clients as owners of CTI.

168.     Although Symons knew that the Boomer System was incurring net trading losses for the period October 2009 through August 2010, Symons did not take steps sufficient to ensure that CTI's salespeople disclosed that information to Clients.

169.     Similarly, although Symons was aware that slippage costs have a material impact on the performance of CTI's Systems, Symons did not take steps sufficient to ensure that CTI's salespeople did not misrepresent the impact of slippage on the past and potential profitability of CTI's Systems.

170.     Similarly, although Symons knew that Boomer and Victory did not begin trading live until 2009 and 2010, respectively, he directed CTI's salespeople to tell Clients that the Systems began trading live in 2007 or earlier.

171.     Defendant Kline holds himself out to the public as CTI's Chief Compliance Officer (or Compliance Officer) and General Manager.

172.     Kline has stated to Clients that he is responsible for ensuring that CTI abides by Commission rules and regulations.

173.     Kline controls the day-to-day operations of CTI's Los Angeles office, including the hiring of CTI's salespersons at the Los Angeles office.

174.     Kline communicates on a regular basis with CTI's IBs.

175.     Kline participates in the decision making process regarding Client refunds, and he is responsible for handling Client complaints.

176.     Symons and Kline actively participated in the conduct described in this Complaint by personally engaging in the conduct, or by directing, condoning, approving, or facilitating CTI's employees and agents (including salespeople) who engaged in the conduct.

177.     Symons and Kline controlled CTI and knowingly induced, directly or indirectly, the acts described above and continue knowingly to induce, directly or indirectly, the ongoing conduct of CTI.

## V. COUNT ONE

**Violations of Sections 4o(1)(A) and (B) of the Act, 7 U.S.C. § 6o(1)(A) and (B) (2006), and Commission Regulation 4.41(a)**

178.     The allegations set forth in paragraphs 1 through 177 are realleged and incorporated herein by reference.

179.     Section 4o(1)(A) of the Act, 7 U.S.C. § 6o(1)(A) (2006), provides that it shall be unlawful for a commodity trading advisor ("CTA") or associated person ("AP") of a CTA, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly "to employ any device, scheme or artifice to defraud any client...or prospective client...."

180.     Section 4o(1)(B) of the Act, 7 U.S.C. § 6o(1)(B) (2006), provides that it shall be unlawful for a CTA or AP of a CTA, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly "to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client...or prospective client...."

181.     Commission Regulation 4.41(a), 17 C.F.R. § 4.41(a) (2011), provides that no CTA may advertise in a manner which "(1) [e]mploys any device, scheme or artifice to defraud

any...client or prospective...client [or] (2) [i]nvolves any transaction, practice or course of business which operates as a fraud or deceit upon any...client or any prospective...client."

182.     Cooper Trading and CTI Group, LLC have engaged, and are engaging, in the business of providing advice to Clients as to the advisability of trading futures contracts by soliciting the general public to purchase subscriptions to Trading Systems and by using the Trading Systems to generate trading recommendations, which are made available to Clients, who open managed trading accounts.

183.     Defendants Kline and Symons are APs of a CTA in that they are associated with Cooper Trading and CTI Group, LLC as a partner, officer, employee, consultant or agent and are involved in the solicitation of Clients' discretionary accounts or supervise persons engaged in the solicitation of Clients' discretionary accounts.

184.     Cooper Trading and CTI Group, LLC, operating as the common enterprise referred to herein as CTI (through the acts of their agents and employees, including Kline and others), and Kline, have knowingly and/or with reckless disregard for the truth engaged in conduct, as alleged herein, that violates Sections $4o(1)(A)$ and (B) of the Act, 7 U.S.C. §§ $6o(1)(A)$ and (B) (2006), in that, by use of the mails or other means or instrumentalities of interstate commerce, they directly or indirectly employed a device, scheme, or artifice to defraud Clients, and they engaged in transactions, practices or courses of business that operated as a fraud or deceit upon Clients.

185.     CTI's violations of Sections $4o(1)(A)$ and (B) of the Act, 7 U.S.C. §§ $6o(1)(A)$ and (B) (2006), as alleged herein, also constitute violations of Commission Regulation 4.41(a), 17 C.F.R. § 4.41(a) (2011), by CTI.

186.     The devices, schemes, artifices, transactions, practices or courses of business that Defendants employed to defraud Clients or that acted as a fraud upon CTI's Clients, as alleged above, include, but are not limited to false statements to Clients regarding, among other things, CTI and its personnel; the track record and past profitability of CTI's Systems; transaction costs and risks associated with trading via CTI's Systems; CTI's refund history; and false statements in connection with CTI's high-pressure sales tactics.

187.     Each and every material misrepresentation and omission by CTI (by and through its employees and agents) and Kline to Clients, including but not limited to those specifically alleged herein, was made with the knowledge that, or made with reckless disregard for the fact that, they were false and misleading.

188.     In addition, because Defendant Symons trained CTI's salespeople (including directing CTI's salespeople as to what to tell Clients about how long CTI's Systems had been trading live and what to tell Clients about slippage), Symons' knowledge as to the falsity of statements made by CTI's salespeople may be attributed to CTI.

189.     Each material misrepresentation or omission made by Defendants including, but not limited to those specifically alleged herein, constitutes a separate and distinct violation of Sections 4$o$(1)(A) and (B) of the Act, 7 U.S.C. §§ 6$o$(1)(A) and (B) (2006), and Commission Regulation 4.41(a), 17 C.F.R. § 4.41(a) (2011).

190.     The foregoing acts, omissions and failures of Kline, as well as other CTI employees and agents, occurred and are occurring within the scope of their employment, office, or agency with CTI; therefore, CTI is liable for these acts, omissions and failures pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), and Commission Regulation 1.2, 17 C.F.R. § 1.2 (2011).

191.      Symons and Kline directly or indirectly control CTI, did not act and are not acting

in good faith, or knowingly induced and are knowingly inducing, directly or indirectly, the acts

constituting CTI's violations, and are thus liable, pursuant to Section 13(b) of the Act, 7 U.S.C. §

13c(b) (2006), for CTI's violations of Sections 4*o*(1)(A) and (B) of the Act, 7 U.S.C. §§

6*o*(1)(A) and (B) (2006), and Commission Regulation 4.41(a), 17 C.F.R. § 4.41(a) (2011).

## VI. <u>COUNT TWO</u>

### Violation of Commission Regulation 4.41(b)(2)

192.      The allegations set forth in paragraphs 1 through 191 are realleged and

incorporated herein by reference.

193.      Commission Regulation 4.41(b)(2), 17 C.F.R. § 4.41(b)(2) (2011), provides that

no person may present the performance of any simulated or hypothetical commodity interest

account, unless a prescribed statement (stating, among other things, the inherent limitations of

hypothetical performance data) is disclosed prominently and in immediate proximity to the

simulated or hypothetical performance being presented.

194.      Cooper Trading and CTI Group, LLC (acting as the common enterprise referred

to herein as CTI), through the acts of their employees and agents, violated Commission

Regulation 4.41(b)(2), 17 C.F.R. § 4.41(b)(2) (2011), in that CTI failed prominently to display

the proscribed disclosure statement in immediate proximity to the simulated or hypothetical past

performance results provided to Clients by CTI in certain of CTI's promotional material.

195.      Each failure prominently to disclose the proscribed disclosure statement in

proximity to simulated or hypothetical performance results constitutes a separate and distinct

violation of Commission Regulation 4.41(b)(2), 17 C.F.R. § 4.41(b)(2) (2011).

196.     Each failure by the employees and agents of Cooper Trading and/or CTI Group, LLC (operating as the common enterprise referred to above as CTI), prominently to disclose the proscribed disclosure statement in proximity to simulated or hypothetical performance results, occurred and is occurring within the scope of their employment, office, or agency with CTI; therefore, CTI is liable for these acts, omissions and failures pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2006), and Commission Regulation 1.2, 17 C.F.R. § 1.2 (2011).

197.     Symons and Kline directly or indirectly control CTI, did not act and are not acting in good faith, or knowingly induced and are knowingly inducing, directly or indirectly, the acts constituting CTI's violations, and are thus liable, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006), for CTI's violations of Commission Regulation 4.41(b)(2), 17 C.F.R. § 4.41(b)(2) (2011).

## VII. <u>COUNT THREE</u>

### Disgorgement of Funds from the Relief Defendants

198.     The allegations set forth in paragraphs 1 through 197 are realleged and incorporated herein by reference.

199.     Client funds were transferred from CTI to Relief Defendants Snonys and Dragonfyre.

200.     On information and belief, Snonys and Dragonfyre are owned or operated by Defendants Symons, and Kline, respectively.  Funds transferred to those companies from CTI are the fruits of CTI, Symons and Kline's violations of the Act and Commission Regulations.

201.     Consequently, Snonys and Dragonfyre have been unjustly enriched by the illegal conduct of CTI, Symons, and Kline, and therefore do not have a legitimate claim to or interest in those funds.

202.     Moreover, to the extent that Snonys and Dragonfyre provided any purported

services to CTI, Snonys and Dragonfyre received Client funds as a result of the Defendants'

fraudulent conduct beyond which they would have any legitimate entitlement to or interest.

203.     Relief Defendants Snonys and Dragonfyre should be required to disgorge those

funds or the value of those funds that they received from the acts and practices of Defendants

that constitute violations of the Act and Commission Regulations.

## VIII. RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that this Court, as authorized by Section 6c

of the Act, as amended by the Dodd-Frank Act, Pub. L. No. 111-203, Title VII (the Wall Street

Transparency and Accountability Act of 2010), §§ 701-774, 124 Stat. 1376 (enacted July 21,

2010), to be codified at 7 U.S.C. § 13a-1, and pursuant to its own equitable powers:

A.     Find Defendants liable for violating Sections 4o(1)(A) and (B) of the Act, 7 U.S.C. §§

6o(1)(A) and (B) (2006), and Commission Regulations 4.41(a) and (b)(2), 17 C.F.R. § 4.41(a)

and (b)(2) (2011);

B.     Enter an *ex parte* statutory restraining order and an order of preliminary injunction

restraining and enjoining Defendants and Relief Defendants, and any successors thereof, and all

persons insofar as they are acting in the capacity of their agents, servants, successors, assigns,

and attorneys, and all persons insofar as they are acting in active concert or participation with

them who receive actual notice of such order by personal service or otherwise, from directly or

indirectly:

> 1.     destroying, mutilating, concealing, altering or disposing of any books and
> records, documents, correspondence, brochures, manuals, electronically stored data, tape
> records or other property of Defendants or Relief Defendants, wherever located,
> including all such records concerning Defendants' and Relief Defendant's business
> operations;

- 40 -

2.      refusing to permit authorized representatives of the Commission to inspect, when and as requested, any books and records, documents, correspondence, brochures, manuals, electronically stored data, tape records or other property of Defendants or Relief Defendants, wherever located, including all such records concerning Defendants' and Relief Defendants' business operations; and

3.      withdrawing, transferring, removing, dissipating, concealing, or disposing of, in any manner, any funds, assets, or other property, wherever situated, including but not limited to, all funds, personal property, money or securities held in safes, safety deposit boxes and all funds on deposit in any financial institution, bank or savings and loan account held by, under the control of, or in the name of any of the Defendants or Relief Defendants;

C.      Enter orders of preliminary and permanent injunction prohibiting Defendants and any of their affiliates, agents, servants, employees, successors, assigns, attorneys and persons in active concert or participation with them who receive actual notice of such order by personal service or otherwise, from directly or indirectly:

1.      violating Sections 4*o*(1)(A) and (B) of the Act, 7 U.S.C. §§ 6*o*(1)(A) and (B) (2006), and Commission Regulations 4.41(a) and (b)(2), 17 C.F.R. § 4.41(a) and (b)(2) (2011);

2.      trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, as amended by the Dodd-Frank Act, Pub. L. No. 111-203, Title VII (the Wall Street Transparency and Accountability Act of 2010), §§ 701-774, 124 Stat. 1376 (enacted July 21, 2010), to be codified at 7 U.S.C. § 1a(40));

3.      entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Commission Regulation 1.3(hh), 17 C.F.R. § 1.3(hh) (2011) ("commodity options"), security futures products, and/or foreign currency (as described in Sections 2(c)(2)(B) and 2(c)(2)(C)(i) of the Act, as amended by the Dodd-Frank Act, Pub. L. No. 111-203, Title VII (the Wall Street Transparency and Accountability Act of 2010), §§ 701-774, 124 Stat. 1376 (enacted July 21, 2010), to be codified at 7 U.S.C. §§ 2(c)(2)(B) and 2(c)(2)(C)(i)) ("forex contracts"), for their own personal accounts or for any account in which they have a direct or indirect interest;

4.      having any commodity futures, options on commodity futures, commodity options, security futures products, and/or forex contracts traded on their behalf;

5.      controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney, letter of direction, or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, security futures products, and/or forex contracts;

6.     soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, security futures products, and/or forex contracts;

7.     applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2011);

8.     acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2011)), agent, or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2011); and

9.     engaging in any business activities related to commodity futures, options on commodity futures, commodity options, security futures products, and/or forex contracts trading;

D.     Enter an order directing Defendants and Relief Defendants, and any successors thereof, to provide Plaintiff immediate and continuing access to their books and records;

E.     Enter an order directing Defendants and Relief Defendants, and any successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received, including but not limited to salaries, commissions, loans, fees, and revenues, derived, directly or indirectly, from acts or practices which constitute violations of the Act and Commission Regulations as described herein, including pre-judgment interest thereon from the date of such violations;

F.     Enter an order directing Defendants, and any successors thereof, to make full restitution to every Client whose funds were received by them as a result of acts and practices which constituted violations of the Act and Commission Regulations, as described herein, and interest thereon from the date of such violations;

G.     Enter an order directing that Defendants and Relief Defendants, and any successors thereof, make an accounting to the Court of all their assets and liabilities, together with all funds they received from and paid to Clients and other persons in connection with the creation,

development, sale, and solicitation of Trading Systems, and all disbursements for any purpose

whatsoever of funds received from the creation, development, sale, and solicitation of Trading

Systems, including salaries, commissions, interest, fees, loans and other disbursements of money

and property of any kind, from January 2009 through and including the date of such accounting;

H.     Enter an order directing Defendants to pay civil monetary penalties, to be assessed by

the Court, in an amount not to exceed the greater of $140,000 or triple the monetary gain for

each violation of Sections 4$o$(1)(A) and (B) of the Act, 7 U.S.C. §§ 6$o$(1)(A) and (B) (2006), and

Commission Regulations 4.41(a) and (b)(2), 17 C.F.R. § 4.41(a) and (b)(2) (2011);

I.     Enter an order providing for such other and further equitable and ancillary relief as

this Court may deem necessary and appropriate; and

J.     Enter an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C.

§§ 1920 and 2412(a)(2).

Dated: New York, NY
       May 11, 2012

                              Respectfully submitted,

                              U.S. COMMODITY FUTURES
                              TRADING COMMISSION

                              By: _____
                              Stephen J. Obie
                              Regional Counsel and Associate Director

                              R. Stephen Painter, Jr.
                                  (*Pro hac vice* admission application to be filed)

                              Laura A. Martin

                              David W. MacGregor
                              Chief Trial Attorney
                                  (*Pro hac vice* admission application to be filed)

                              Division of Enforcement

- 43 -

U.S. Commodity Futures Trading Commission
Eastern Regional Office
140 Broadway, 19th Floor
New York, NY 10005
Phone (646) 746-9762
Fax (646) 746-9940